*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
June 17, 2021

Plaintiff-Appellee,

v

No. 350550
Oakland Circuit Court
LC No. 2018-269345-FC

CHRISTOPHER ALEXANDER JOHNSON,

Defendant-Appellant.

Before: MURRAY, C.J., and FORT HOOD and RICK, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial conviction of second-degree murder, MCL 750.317. Defendant was sentenced as a fourth habitual offender, MCL 769.12, to 100 to 150 years' imprisonment. We affirm.

## I. STATEMENT OF FACTS

This case arises from the murder of Susan Kelley (Susie), the girlfriend of Cortney Johnson (CJ), who is defendant's brother. Susie and CJ have a daughter, MJ, who was 11 months old at the time. They lived together in a duplex on East Elza, in Hazel Park, although CJ was not supposed to be living there under a personal protection order (PPO) that Susie had against him. Defendant occasionally stayed with CJ and Susie on East Elza.

On November 7, 2018, Susie went with CJ to drop him off at his job delivering furniture for Gardner-White in Auburn Hills at 6:00 a.m., so Susie could have use of the car for the day. Defendant had stayed at their house the night before, so he stayed with MJ. CJ worked with Josh Andrzejewski (Josh),[1] and they worked two shifts delivering furniture that day. CJ was in contact with Susie over Facebook Messenger throughout the day because Susie had broken her cell phone a few days before. Susie was upset because defendant said that Susie was a bad mother, called MJ

---

[1] Josh's testimony mirrored CJ's, and corroborated CJ's testimony that they spent the day together working.

a "hoe," and she texted CJ, " 'Tell your brother to leave 'cause s*** is getting out of hand.' " Susie texted CJ that defendant was throwing things at her, the relationship between Susie and CJ was over, and she was taking MJ away. These were the last messages that CJ received from Susie around 3:45 p.m.

CJ and Josh picked up a second shift, and finished their last delivery in Ferndale around 10:50 p.m. Because they were close to East Elza, and CJ had not heard from Susie and was worried, they stopped by the house. Only CJ went inside, and he saw MJ asleep on the couch. The doors to the two bedrooms were closed, there was a wet spot on the carpet, and it smelled of Pine-Sol. CJ saw a plastic shopping bag near the front door which looked like it had some of MJ's clothes in it, and picked it up. Defendant "snatched it" out of CJ's hands, and told him not to touch it. CJ testified that defendant was not acting like his normal self, but did not seem drunk. Defendant kept saying that he needed to talk to CJ, and told CJ, " 'don't go off the rocker.' " But CJ said that he had to get back to work, and defendant never came out with it. CJ felt like something was not right, so he took MJ, and drove his own car back to the warehouse in Auburn Hills. Josh followed CJ's car. They unloaded and then each went home.

When CJ took MJ to the front door, it was locked, and there was no answer. He looked through the window, and saw defendant inside asleep sitting up on the couch with a beer in his hand. CJ remembered that his bedroom window had been opened recently, so he went around the house and the window was unlocked. CJ retrieved a chair from the front of the house, put it under the window outside the house, put MJ through the window and onto the bed inside directly underneath the window, and then climbed inside. CJ turned on the light, and discovered Susie on the floor.

Susie was lying face down, with her hands tied behind her back, and her feet bound. CJ touched her and called her name, but there was no response. She felt cold, and there was blood on the carpet near her face. CJ grabbed MJ and ran into the living room, waking defendant up. CJ repeatedly asked defendant, "What did you do?" and defendant did not respond, so CJ left, went to a nearby Walgreen's, and called Josh for help. Josh and his fiancée met CJ at Walgreen's. Josh said that they needed to call 911, but CJ said that he could not call because of the PPO. They all got into CJ's car, and Josh drove them back to East Elza. Defendant was standing outside, and CJ was crying and yelling, "Why? Why?" CJ testified that defendant did not respond, and Josh testified that defendant put his finger up to his lips. Defendant approached the vehicle, so Josh backed up, drove around the block, and called 911. The police instructed them to meet at a nearby auto shop, and then followed the police back to the house. The police separated everyone, and secured them in separate police vehicles.

Defendant testified on his own behalf at trial. Defendant said that he left the home several times that day, and was gone for several hours between approximately 1:00 and 6:00 or 7:00 p.m. to sell illegal drugs. When he returned, he thought Susie was working in the bedroom with the door closed while MJ played in the living room. But when defendant opened the bedroom door, the window was open and the blinds in disarray, and Susie was lying face down on the floor and was tied up. He checked Susie for a pulse, but she was cold. Defendant "weighed [his] options," but did not call 911 because he thought, "we all in trouble . . . . " Because there was nothing he could do, he walked to the corner party store, Player's Market, with MJ and bought beer, and sat at home until CJ stopped by. Defendant said that he needed to talk to CJ, but CJ had to return to

work, and took MJ with him. Defendant did not tell CJ about Susie because he was in shock, and trying to figure out how to tell him. Defendant did not leave the house again, and fell asleep weeping. He believed that someone broke into the home, killed Susie, and stole money and drugs. Defendant denied hitting, punching, or striking Susie, throwing anything at her, tying her up, or trying to kill her. He denied cleaning anything.

The officer in charge, Detective Janeen Gielniak, testified on rebuttal that Kilburn's, a construction equipment rental company next to Player's Market, had an exterior surveillance camera that captured the front of the East Elza home. She watched the video for the day of the murder, and observed that defendant only left the house for a few minutes at a time at 9:55 a.m., 2:06 p.m., 6:22 p.m., and 8:34 p.m. Gielniak never saw defendant leave the home for hours at a time.

Several police officers with the Hazel Park Police Department were dispatched to East Elza, including Officer Ryan McCabe, Officer Joshua Coste, Sergeant Ryan Zook, Officer Jacob Morris, and Gielniak. Coste stood by the occupants of CJ's vehicle while McCabe approached the house. Defendant was outside. McCabe asked defendant if he lived there, and defendant said that he was just visiting. McCabe asked defendant if anyone was in the house, and defendant said, "Yeah, she tied up and s***." McCabe asked defendant if she was still alive, and defendant answered, "Not that I know of." McCabe described defendant's demeanor as calm and nonchalant.

Morris and Zook went inside, and Zook found Susie. Zook went outside to talk to McCabe, and Morris went into the bedroom and saw Susie face down, with her hands and feet tied. Morris rolled Susie over to check for a pulse, and her shirt was pulled up over her face, which Morris pulled down to check for breathing. Susie's face was swollen and bloody. She had blunt force trauma to her head and neck, and what looked like rug burn to her chin. Emergency medical services were called, and the emergency medical technicians attached an electrocardiogram monitor to take Susie's vital signs, but there were no signs of life.

McCabe did a walkthrough of the scene for evidence, and observed a chair outside of the house placed next to the bedroom window where Susie was found. He noted a plastic bag containing baby clothing near the front door, which had a baby sock soaked in blood inside. In the extra bedroom was a cell phone broken into several pieces. Near the door of the bedroom where Susie was found were a towel and cleaning sponge soaked in blood. There were bloody footprints on the vinyl kitchen floor. There was a baby gate lying on the carpet in the living room, and when it was moved there was a wet spot on the floor, of a faded red color, that smelled of cleaning products. There were several other similar wet spots on the carpet smaller in size. There was a fan in the living room that was turned on and directed toward the wetness. Blood was found on the living room wall, and in the bathtub. Susie's laptop was found on the bed near her body, with headphones plugged into it. Gielniak immediately noticed the smell of Pine-Sol or Mr. Clean and wet spots on the carpet that were pink in color. She noted that the laundry room smelled like laundry detergent and freshly washed clothes, and the bathroom smelled like someone had just showered.

When defendant was brought to the station, he was first interviewed by Gielniak and Detective Xavier Piper. Gielniak noted that defendant was very clean and smelled like he had just taken a shower—the same smell from the laundry room and bathroom. Defendant changed his

stories of what happened the night before several times. When defendant was confronted about being inconsistent, he would shrug and not respond. Defendant denied arguing with Susie, scrubbing the floor, or taking a shower. Detective Joseph Lowry watched the recorded interview, and noticed that defendant was hiding his right hand from the detectives. So much so that during the video, Piper looked under the table to see what defendant was doing. Lowry and another detective decided to gather defendant's clothing for evidence, so they removed defendant from the booking cell. Lowry saw that defendant's right hand was extremely swollen in comparison to his left hand, which looked normal.

Dr. Andrew Hanosh of the Oakland County Medical Examiner's Office performed Susie's autopsy. He testified that Susie had multiple blunt force injuries to her face, and her nose was fractured. There were tears to her skin and left eyelid, and tears and bruising inside her lips and mouth consistent with being dragged. The bruises were darkest on the prominent parts of her face, consistent with being face down on a surface. Dr. Hanosh cut the bindings off of her hands and feet. There was a congestion of blood in her hands because the bindings were so tight, but no significant injuries caused by the bindings. This showed that she was still alive when bound, but was either unconscious or had a depressed level of consciousness because there were no signs of resistance. When he removed her scalp, there were hemorrhages all over. There was bacteria in Susie's lungs, meaning, she had inhaled the contents of her mouth because something was blocking her upper airway. The cause of death was asphyxia by compression and/or smothering, with multiple blunt force injuries as a contributing factor. The manner of death was homicide.

Defendant was charged with one count of first-degree premeditated murder. His jury trial lasted six days, and he was found guilty of the lesser included offense of second-degree murder.

## II. PROSECUTORIAL ERROR–OTHER-ACTS EVIDENCE AND PRIVILEGED COMMUNICATIONS

Defendant argues that the prosecutor erred by questioning defendant about other-acts evidence the trial court deemed inadmissible before trial, and about defendant's communications with his attorney about an alibi defense, thereby violating the attorney-client privilege.[2]

A defendant must timely and specifically object to allegedly improper conduct by the prosecutor during trial, and request a curative instruction, to preserve a claim for prosecutorial error. *People v Barber*, 255 Mich App 288, 296; 659 NW2d 674 (2003); *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). Similarly, "[t]o preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). Defendant did not object during cross-examination when the prosecutor questioned defendant regarding an alibi, and why defendant had not mentioned it before that point. Nor did defendant object during recross-examination when the prosecutor questioned defendant about the

---

[2] This Court explained in *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015), that a more appropriate label for most claims of prosecutorial misconduct would be " 'prosecutorial error,' " while only the most extreme cases rise to the level of " 'prosecutorial misconduct.' "

other-acts evidence. Defense counsel never requested a curative instruction. Therefore, this issue is not preserved. *Barber*, 255 Mich App at 296; *Bennett*, 290 Mich App at 475.

Because this issue is unpreserved, it is reviewed for plain error affecting substantial rights. *People v King*, 297 Mich App 465, 472; 824 NW2d 258 (2012). On plain-error review, the defendant has the burden to show (1) "error"; (2) that was "plain," meaning "clear or obvious"; and (3) that affected substantial rights or caused prejudice, meaning "that the error affected the outcome of the lower court proceedings." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "[O]nce a defendant satisfies these three requirements, an appellate court must exercise its discretion in deciding whether to reverse," but "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. (citation and quotation marks omitted; last alteration in original).

"Given that a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). This Court reviews prosecutorial error on a case-by-case basis by examining the record and the prosecutor's remarks in context. *People v Mann*, 288 Mich App 114, 119; 792 NW2d 53 (2010). "The propriety of a prosecutor's remarks depends on all the facts of the case." *People v Rodriguez*, 251 Mich App 10, 30; 650 NW2d 96 (2002). The prosecutor's comments must be read as a whole, and evaluated by this Court in light of the defendant's arguments, and the relationship the comments bear to the admitted evidence. *People v Brown*, 279 Mich App 116, 135; 755 NW2d 664 (2008).

## A. OTHER-ACTS EVIDENCE

Before trial, the prosecution filed a notice of intent to admit other-acts evidence under MRE 404(b). The prosecution sought to admit evidence that in 2001, defendant was involved in the arson of a trailer with people inside, and that in 2016, he stabbed CJ. The prosecution asserted that the other-acts evidence was relevant to show intent, and absence of mistake or accident. Defendant filed a response, arguing that the evidence was irrelevant and should be excluded, and its probative value was substantially outweighed by unfair prejudice. On the first day of trial, the court addressed the issue and determined that the 2001 arson was too distant in time and too dissimilar to the current charge to be admissible under MRE 404(b), and the 2016 stabbing was more prejudicial than probative because it indicated defendant's character more than showing motive. The court cautioned defense counsel, however, that the door could be opened to such evidence if any witnesses testified that defendant loved CJ, or would never hurt a fly, etc.

During cross-examination, the prosecutor asked several times why defendant sat and did nothing for several hours after discovering Susie's body. Defendant answered that he was "thinkin' about gettin' revenge," and he would "meet them with the same intensity they met us with." The prosecution asked, "No stranger to violence? You don't have a problem with violence?" and defendant answered, "If it's absolutely necessary." Defendant admitted that he had used violence in the past, and that he had tried to kill someone before. But he denied stabbing CJ in 2016.

The prosecution also asked, "when you need to get revenge in 2001, somebody beat you up, right, made you mad, correct?" Defendant responded that he got hit with a baseball bat by "three racist white boys" and to get revenge, he tried to burn down their trailer. This happened after defendant discharged himself from the hospital and went back to get revenge. Defendant said this incident happened when he was much younger, and he did not have the same mentality anymore, but he would still use violence when absolutely necessary to protect himself and his family.

MRE 404(b) precludes the admission of evidence of a defendant's other crimes, wrongs, or acts for the purpose of showing the defendant's propensity to commit a crime. However, a defendant "opens the door" to admission of typically inadmissible evidence when the defendant inquires about or refers to such evidence. After that, the prosecution may properly introduce evidence in response to the evidence and impressions raised by the defendant. *People v Figgures*, 451 Mich 390, 399-400; 547 NW2d 673 (1996). Moreover, a "[d]efendant cannot complain of [the] admission of testimony which [the] defendant invited or instigated." *People v Whetstone*, 119 Mich App 546, 554; 326 NW2d 552 (1982). See also *People v McMaster*, 154 Mich App 564, 570; 398 NW2d 469 (1986) (It is well established that "[w]here a defendant raises the issue of his prior bad acts, he has waived any claim of error.").

Here, defendant opened the door to the admission of the other-acts evidence when he testified that he was thinking about getting revenge against whoever committed this crime, and would meet them with the same intensity, meaning, violence. After that, the prosecution was allowed to question defendant about his prior bad acts, including the instance where he sought revenge by attempting arson. *Figgures*, 451 Mich at 399-400. Because defendant opened the door by speaking about revenge, the other-acts evidence, although previously ruled inadmissible by the court, was properly admitted. See *People v Horn*, 279 Mich App 31, 35-36; 755 NW2d 212 (2008) (other-acts evidence was properly admitted once the defendant opened the door by inquiring on the issue). As such, there was no plain error affecting defendant's substantial rights when the prosecutor questioned defendant about the other-acts evidence, *Carines*, 460 Mich at 763, and no prosecutorial error denying defendant a fair and impartial trial, *Dobek*, 274 Mich App at 63.

### B. ALIBI DEFENSE

At the end of the fourth day of trial, defense counsel made a record of defendant's intent to testify on his own behalf. After the jury was dismissed, the prosecutor said, "And I'm also assuming that there's no alibi defense that he's going to be calling because there has been no notice filed." The court told defense counsel that he had to file an alibi notice, and defense counsel responded, "That's fair, Judge." Defendant testified the next day, and during direct examination when he testified about visiting a female friend during the day of November 7, 2018, the prosecution objected because no alibi was disclosed before trial and no name was provided, and requested that defendant's testimony be stricken. The parties approached the bench and had a discussion off the record, and when defense counsel resumed questioning, he said, "I want to skip ahead a little bit, we got a little farther afield than I had anticipated." Defendant resumed his testimony by saying that he got home that day between 6:00 and 7:00 p.m.

During cross-examination, the prosecutor asked defendant if he never told anyone about the female friend he met up with during the day up until that day at trial, and at first defendant

said, "I never told anybody that I was with 'em." Then defendant said that "[t]here's a record of it," and he had sent several letters to his attorney mentioning an alibi. However, defendant did not know that he was supposed to give the alibi's name. Defendant said that he did not want to "invade [that person's] privacy," and that the people he associates with are not in good standing with the law, so that is why he never gave a name.

On the fifth day of trial, outside the presence of the jury, the court made a record of some of the evidentiary matters that occurred during trial. The court noted that defendant testified about an alibi that was not noticed or presented to the prosecution as required, but was not faulting defense counsel because it was unclear whether defense counsel knew that defendant would testify about an alibi. Regardless, the prosecution properly objected to the alibi testimony. Defense counsel agreed that the court's recollection of these matters was correct, but noted that he went through his communications with defendant and the word "alibi" was mentioned in two communications, but defendant regularly fought visitation with defense counsel. The details of an alibi were not provided until defendant testified that day, so although defendant mentioned "alibi" in his communication, defense counsel was not under any belief that defendant would provide information regarding an alibi. The prosecution noted its objection to the alibi testimony since no notice was given before trial.

"A prosecutor should not question a defendant regarding conversations with his or her attorney, as the attorney-client privilege is fundamental to our system of jurisprudence and the privilege is destroyed if improper inference can be drawn from its exercise." *Dobek*, 274 Mich App at 72 (quotation marks and citation omitted). The prosecutor did elicit testimony from defendant about whether he had previously disclosed an alibi to defense counsel. This inquiry was in response to defendant's testimony that he had met up with other people during the day of the murder, even though no alibi notice had been filed before trial. Although the prosecutor's questioning about conversations defendant had with defense counsel was improper, it did not affect the outcome of defendant's trial. The questioning was brief and isolated in nature, in contrast to the overwhelming evidence that implicated defendant in committing the murder of Susie. For instance, defendant was home for most of the day with Susie, they were arguing, and there was evidence that defendant attempted to clean up the scene. Therefore, defendant has not demonstrated that he was denied a fair and impartial trial because of the questioning related to the attorney-client privilege.

## III. PROSECUTORIAL ERROR–FALSE TESTIMONY

Defendant argues that he was denied his due-process right to a fair trial because Gielniak gave false testimony at trial.

As stated above, a defendant must timely and specifically object to allegedly improper conduct by the prosecutor during trial, and request a curative instruction, to preserve the issue on appeal. *Barber*, 255 Mich App at 296. And, to preserve the evidentiary issue, defendant had to object to the admission of the false testimony at trial. *Aldrich*, 246 Mich App at 113. Additionally, due-process arguments must be raised in the trial court to be preserved for appeal. *People v Hanks*, 276 Mich App 91, 92; 740 NW2d 530 (2007). Defendant failed to object to the alleged false testimony at trial, or raise a due-process argument, so this issue is not preserved. Defendant's unpreserved issues, constitutional and nonconstitutional, are reviewed for plain error. *Id*.

During redirect examination, Gielniak testified that the same questions are asked during an interrogation interview to look for deception, and when someone is telling the truth, their answers will be consistent; an indication of deception is when the story changes. Gielniak testified that defendant was inconsistent, and when confronted about it, he changed his answer again. As a question from the jury, the court asked Gielniak, "if you know, were there any inconsistencies or changing stories in the interviews with [CJ] or Josh?" and Gielniak responded, "No." The court clarified, "No, you don't know, or no there were—" and Gielniak responded, " . . . . No, there were not. No, there weren't."

The recorded interviews of CJ were not admitted as evidence at trial. Rather, defendant relies on three recorded interviews of CJ that he attached as exhibits to his brief on appeal. Defendant filed a motion to remand in this Court to expand the evidentiary record, which this Court denied. *People v Johnson*, unpublished order of the Court of Appeals, entered September 3, 2020 (Docket No. 350550). Documents or other evidence that were not presented in the trial court will not be considered by this Court on appeal, *Isagholian v Transamerica Ins Corp*, 208 Mich App 9, 18; 527 NW2d 13 (1994), and parties many not expand the record on appeal, *Lamkin v Engram*, 295 Mich App 701, 703 n 2; 815 NW2d 793 (2012). Because the crux of defendant's argument relies on evidence that was not admitted at trial, and therefore not properly before this Court, and because defendant failed to object to the testimony at trial, defendant is not entitled to relief on appeal.[3]

## IV. PROSECUTORIAL ERROR–*BRADY* VIOLATION

Defendant argues that the prosecution violated his right to a fair trial by withholding exculpatory evidence from the defense, thereby preventing defense counsel from preparing an adequate defense.

To preserve the issue of whether the prosecution suppressed evidence in violation of a defendant's due-process rights, the defendant must move the trial court for a new trial or relief from judgment. *People v Abcumby-Blair*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 347369); slip op at 2, citing *People v Cox*, 268 Mich App 440, 448; 709 NW2d 152 (2005). Defense counsel noted in his motion to withdraw filed before sentencing and at sentencing that defendant had attempted to file a motion for a new trial, acting *in propria persona*. However, no such motion was in the lower court record, and the trial court stated at sentencing that it was not in possession of it. Defendant filed a motion to remand this case to move for a new trial in the trial court, but he failed to persuade this Court that a remand was necessary, and the motion to remand was denied. *People v Johnson*, unpublished order of the Court of Appeals, entered September 3, 2020 (Docket No. 350550). Therefore, this issue is not preserved. *Abcumby-Blair*,

---

[3] We note that "[i]t is inconsistent with due process when the prosecution allows false testimony from a state's witness to stand uncorrected[,]" but "it is the *effect* of a prosecutor's failure to correct false testimony that is the crucial inquiry for due process purposes." *People v Smith*, 498 Mich 466, 475-476; 870 NW2d 299 (2015) (quotation marks and citations omitted). Here, the prosecution did not capitalize on Gielniak's allegedly false testimony, and there was no reasonable likelihood that her testimony affected the judgment of the jury given the overwhelming evidence implicating defendant in the crime.

___ Mich App at ___; slip op at 2. Review of this unpreserved issue is for plain error affecting substantial rights. *Id.*

To establish a violation under *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963), a defendant must show that "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014). These requirements were explained as follows:

> The government is held responsible for evidence within its control, even evidence unknown to the prosecution, *Kyles v Whitley*, 514 US 419, 437; 115 S Ct 1555; 131 L Ed 2d 490 (1995), without regard to the prosecution's good or bad faith, *United States v Agurs*, 427 US 97, 110; 96 S Ct 2392; 49 L Ed 2d 342 (1976) ("If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor."). Evidence is favorable to the defense when it is either exculpatory or impeaching. *Giglio v United States*, 405 US 150, 154; 92 S Ct 763; 31 L Ed 2d 104 (1972) ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule [of *Brady*]."), quoting *Napue v Illinois*, 360 US 264, 269; 79 S Ct 1173; 3 L Ed 2d 1217 (1959). To establish materiality, a defendant must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v Bagley*, 473 US 667, 682; 105 S Ct 3375; 87 L Ed 2d 481 (1985). This standard "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . ." *Kyles*, 514 US at 434. The question is whether, in the absence of the suppressed evidence, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* In assessing the materiality of the evidence, courts are to consider the suppressed evidence collectively, rather than piecemeal. *Id.* at 436. [*Chenault*, 495 Mich at 150-151.]

Defendant argues that the prosecution withheld the following evidence: (1) surveillance video from Kilburn's and Player's Market; (2) CJ's criminal history; (3) cell phone, laptop, and Facebook data; (4) notes from Gielniak's conversation with Susie's father, and (5) Gardner-White GPS data.

## A. SURVEILLANCE VIDEOS

On the fourth day of trial, the court dismissed the jury to discuss a jury question with counsel. One juror asked whether there was surveillance video from the store at the corner, Player's Market. The prosecutor said that there were photographic stills taken from interior surveillance videos from the store, and that the chief of police went to Player's Market and watched the video. However, police could not retrieve the video from the store's surveillance system, so the chief recorded a video of the video with his cell phone, and the cell phone video was of poor quality. The prosecutor said that there was another surveillance video from Kilburn's, another store on the corner, from which the house on East Elza can be seen, as well as people and cars

coming and going. The prosecutor never got a full copy of the Kilburn's video because something was wrong with it, so defense counsel never received a copy, but it was referenced in one of the police reports so it came as "no surprise." Defense counsel agreed that Gielniak could testify as to the two occasions defendant was captured inside the party store, but objected to the admission of the Kilburn's video because even though he knew it existed, he never saw it, and did not have a chance to fully investigate it. The court clarified that Gielniak could testify about the surveillance video from Player's Market, and the jury was brought back in.

Gielniak was asked the question by the jury—whether there was any surveillance video from Player's Market. She answered that there was a camera inside the store, and twice in the evening defendant entered—first at 6:19 p.m. by himself, and again at 8:33 p.m. with MJ. Defendant also went to the store at 9:51 a.m., and Susie went at 11:53 a.m. Gielniak testified that the chief of police took a video of the video using his cell phone, and the police were unable to retrieve a copy of the video from the surveillance system itself. The chief of police verified with the store owner that the time stamps on the video were correct within approximately six minutes.

On the fifth day of trial, Gielniak was recalled by the prosecution in rebuttal, and she testified regarding the Kilburn's surveillance video. On cross-examination, she was asked how long she had been in possession of the video, and she said it was entered into evidence at the beginning of the case by the chief of police. When asked why it had not been provided to the court until now, she answered that it was referenced in the police report, but no one had viewed it other than the chief until she recently did. The timeline in the police report focused on when CJ came home and took MJ. When the jury asked to view the video, the court responded that it was not admitted into evidence.

After the jury was dismissed for deliberations, the court made a record regarding the two surveillance videos. The court indicated that a bench discussion was held wherein the prosecutor indicated that he would be admitting the Player's Market video, but Gielniak said that there were just stills showing defendant and Susie coming in. Then the parties discussed the Kilburn's video, and although a police report had a timeline taken from the video, the video was poor quality and neither party had a copy. The prosecutor had said that he did not have a copy and did not see it until trial started, and was unaware of defense counsel having a copy. The court said, "I haven't heard that there was anything exculpatory in the video, but the prosecutor was not seeking to admit it." The court noted that the prosecution recalled Gielniak to testify in rebuttal about the timeline of defendant's comings and goings as portrayed in the Kilburn's video.

Defense counsel agreed that the court's recollection of these matters was correct, but noted his continuing objection regarding the Kilburn's video that he made during a bench conference, and that the court permitted the testimony about it in rebuttal. The court noted that the video would not have been allowed in if it was not provided, and defense counsel said, "I will note that we did have a version of a breakdown of that video. It's not nearly as complete as what Detective . . . Gielniak as far as what she testified to." Defense counsel said that Gielniak's testimony was much more detailed than in the police report, he did not have her subsequent notes, and she did not see the video until more recently. Defense counsel noted his continuing objection, and understood that it had been overruled.

Regarding the Kilburn's video, the prosecution asserted that there was knowledge of it because it was in the police reports. The prosecutor said that 20 to 25 discs and flash drives were turned over to him, and he made copies for defense counsel, so if defense counsel did not receive the Kilburn's video, it was an oversight. However, defense counsel was aware of it, so he could have asked for it. And Gielniak's testimony about the timeline was proper rebuttal evidence after defendant testified that he left the home for several hours. The court noted that it would ordinarily be concerned except there was nothing about the video that was exculpatory or provided an alibi for defendant.

We agree with the determination made by the trial court, and conclude that defendant has not established the elements for a *Brady* violation. Although it appears that the surveillance videos were not provided to defense counsel, defendant fails to establish that the surveillance videos were favorable to him or material. *Chenault*, 495 Mich at 150. The surveillance videos were not exculpatory, but rather, placed defendant at East Elza for most of the day, and impeached his own testimony that he had left for several hours. Defendant argues that the Player's Market video would have impeached CJ's testimony that Susie did not have a phone because she is allegedly seen talking on a phone while she was inside the store. Defendant fails to establish how this evidence is material. *Id.* The fact that Susie may have been talking on a phone does not establish a reasonable probability that the result of the proceeding would have been different or undermine the confidence of the outcome given the overwhelming evidence implicating defendant in this crime. *Id.* The police found Susie's laptop on the bed with headphones plugged in, corroborating CJ's testimony that they communicated over Facebook Messenger. They also found a cell phone broken into several pieces in the second bedroom. Therefore, defendant has failed to establish a *Brady* violation in relation to the surveillance videos.

## B. CJ'S CRIMINAL HISTORY

Defendant lists evidence in his brief on appeal that he claims was withheld and includes CJ's "criminal history, including whatever conviction resulted in a no contact order being issued against him." This is the only reference to CJ's criminal history throughout the entire argument section related to this issue. The failure to properly brief an issue on appeal constitutes abandonment. *People v McGraw*, 484 Mich 120, 131 n 36; 771 NW2d 655 (2009). Defendant has failed to establish a *Brady* violation in relation to this evidence.

## C. CELL PHONE, LAPTOP, AND FACEBOOK DATA

A juror also asked Gielniak if Susie's laptop was checked to see when it was last used. Gielniak testified that the laptop was taken for a forensic examination, and a search warrant was executed for Susie's and CJ's Facebook records because they were communicating by Facebook Messenger that day. The records showed that the last communication from Susie to CJ was at 3:51 p.m., and there were several messages and calls from CJ to Susie thereafter that went unanswered. Susie's last message to anyone that day was to CJ saying "We done. Getting her away from you sick mother******s." CJ had answered asking her to pick up the phone, and saying he was doing the second shift. On cross-examination, defense counsel asked if Susie was in communication with anyone else that day. Gielniak responded that Susie was in contact with someone called "Fat Koopa," who asked Susie if he could come over, and Susie responded that she did not need him to.

First, there is no indication in the record that this evidence was not disclosed to defense counsel. Assuming arguendo that it was suppressed, and the first element of a *Brady* violation is met, defendant fails to establish how this evidence was favorable to defendant or material. *Chenault*, 495 Mich at 150-151. The messages from Susie to CJ were not exculpatory, but rather, indicated that Susie and defendant had been arguing that day. Although a defense strategy was to argue that Susie was involved with other men, and perhaps someone else had done this or someone else had come over, the messages between Susie and "Fat Koopa" were not material. *Id*. Defendant asserts that he was not provided with cell phone extraction data from defendant's phone, preventing defense counsel from determining whether such data would support defendant's testimony that he met up with other people during the day. Gielniak testified that defendant's cell phone records were analyzed pursuant to a search warrant, but police were unable to retrieve GPS data off the cell phone. Assuming arguendo that this evidence was suppressed, defendant has not argued that it was exculpatory or material, and therefore, fails to establish a *Brady* violation. *Id*.

## D. GIELNIAK'S NOTES

A juror also asked whether Susie's family was questioned to see whether she went to see them that day. Gielniak responded that Susie's father and grandmother were both questioned, they both live in Southwest Detroit, and Susie did not come see them that day. Again, defendant merely lists in his brief on appeal as suppressed evidence "Notes regarding John Kelley's statement to police [that] he did not see Susan Kelley on November 7, a conversation Ms. Gielniak testified to but that was undisclosed to the defense." Defendant makes no argument how this evidence was favorable to defendant or material. *Id*. Indeed, the evidence disfavored defendant as it established that Susie did not go to Southwest Detroit, impeaching defendant's testimony that she did. Regardless, without properly briefing the issue on appeal, it is considered abandoned. *McGraw*, 484 Mich at 131 n 36.

## E. GARDNER-WHITE GPS DATA

The jury also asked Gielniak whether any records from Gardner-White showed that CJ and Josh were making deliveries at the time they said they were. Gielniak answered that she spoke to the Gardner-White coordinator, who provided her with GPS data, that was consistent with the routes CJ and Josh testified about. The data confirmed that CJ and Josh were where they said they were. Assuming this evidence was not disclosed to defense counsel, defendant fails to establish that it was exculpatory or material. *Chenault*, 495 Mich at 150-151. CJ and Josh both testified that they were working together for Gardner-White that day, from approximately 6:30 a.m. to midnight, and that they did two shifts delivering furniture. Defendant has failed to establish a *Brady* violation in this regard. *Id*.

Defendant argues that the suppression of all of this evidence prevented defense counsel from adequately preparing a defense. This argument lacks merit. As discussed, the allegedly suppressed evidence was not exculpatory or material. *Id*. Additionally, defendant was convicted of the lesser included offense of second-degree murder rather than first-degree premeditated murder. Therefore, defendant fails to establish how the suppression of this evidence prevented defense counsel from properly preparing for trial and providing defendant with an adequate defense.

## V. CUMULATIVE EFFECT

Defendant argues that the cumulative effect of the prosecution's errors at trial—presenting other-acts evidence, impeaching the credibility of defendant's alibi based on defendant's refusal to waive the attorney-client privilege, allowing Gielniak to provide false testimony, and withholding discovery materials—denied him a fair trial.

A party must preserve a claim that the cumulative effect of several otherwise harmless errors warrants a new trial. Defendant did not argue in the trial court that any cumulative errors deprived him of a fair trial. Therefore, this issue is not preserved, and is reviewed for plain error affecting substantial rights. *Carines*, 460 Mich at 763.

Under the cumulative error doctrine, this Court will reverse and remand for a new trial when the cumulative effect of several errors establishes that the defendant did not receive a fair trial, even though no one error by itself warranted a new trial. *People v Bahoda*, 448 Mich 261, 292 n 64; 531 NW2d 659 (1995); *People v Cooper*, 236 Mich App 643, 659-660; 601 NW2d 409 (1999). The test on appeal is whether the defendant received a fair trial, despite any irregularities, or whether the irregularities so undermined the fairness of the trial that a new trial is warranted. *People v Skowronski*, 61 Mich App 71, 77; 232 NW2d 306 (1975). The cumulative effect of the actual errors must cause substantial prejudice such that the failure to order a new trial would deny the defendant substantial justice under MCR 2.613(A). *Lewis v LeGrow*, 258 Mich App 175, 200-201; 670 NW2d 675 (2003). In assessing whether the cumulative effect of several otherwise minor errors warrants a new trial, this Court will only aggregate actual errors. *People v LeBlanc*, 465 Mich 575, 591 n 12; 640 NW2d 246 (2002); *Lewis*, 258 Mich App at 200-201.

The prosecutor did not commit error by questioning defendant about other-acts evidence when defendant "opened the door" to such evidence by testifying about seeking revenge. *Figgures*, 451 Mich at 399-400. Although the questioning by the prosecutor regarding defendant's communications with defense counsel about an alibi defense was improper, it amounted to harmless error, and did not affect the outcome of the proceedings given the substantial circumstantial evidence implicating defendant. *Dobek*, 274 Mich App at 72. Defendant failed to establish a violation of due process by the admission of false testimony because he relies on evidence not admitted at trial to make this argument on appeal. *Isagholian*, 208 Mich App at 18. Lastly, defendant failed to establish all of the elements for a *Brady* violation for any of the evidence he claims was suppressed. *Chenault*, 495 Mich at 150-151. Therefore, there was only one actual error, the questioning about privileged communications, rather than several errors for the Court to aggregate to consider as a cumulative effect. *LeBlanc*, 465 Mich at 591 n 12; *Lewis*, 258 Mich App at 200-201. As such, there was no plain error that affected defendant's substantial rights. *Carines*, 460 Mich at 763.

## VI. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that he was denied the effective assistance of counsel because defense counsel (1) failed to object to hearsay evidence indicating defendant was in an altercation with Susie the day she died and that defendant lied about Susie's whereabouts; (2) failed to object to the prosecutorial error during cross-examination when defendant was questioned about other-acts evidence and privileged communications; (3) failed to diligently pursue discovery materials, which

prevented a proper preparation for trial; and (4) failed to object to Gielniak's testimony that defendant was untruthful and CJ was truthful, and failed to present evidence to support the theory that CJ committed the crime.

To preserve an ineffective assistance of counsel argument, the defendant must move for a new trial or request an evidentiary hearing. *People v Head*, 323 Mich App 526, 538-539; 917 NW2d 752 (2018). Defendant failed to file a motion for a new trial or request an evidentiary hearing in the trial court;[4] however, he filed a motion to remand with this Court. As noted, this motion was denied. Because defendant's motion to remand was denied and no evidentiary hearing was held in the trial court, defendant's ineffective assistance of counsel argument is limited to review for errors apparent on the record. *Id*. at 539. "Whether a defendant was deprived of the effective assistance of counsel presents a mixed question of fact and constitutional law. Any findings of fact are reviewed for clear error, while the legal questions are reviewed de novo." *Id*. (citations omitted).

To establish ineffective assistance of counsel, the defendant must show "(1) counsel rendered assistance that 'fell below an objective standard of reasonableness' under prevailing professional norms and (2) that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different[.]' " *People v Muhammad*, 326 Mich App 40, 63; 931 NW2d 20 (2018) (citation omitted, brackets original). " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Id*. (citation omitted). The defendant bears the burden to demonstrate deficient performance and prejudice; thus, the defendant bears the burden of establishing the factual predicate for his claim of ineffective assistance of counsel. *Id*. "Decisions regarding what evidence to present . . . are presumed to be matters of trial strategy, and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy." *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002). There is a strong presumption that the assistance of counsel constitutes sound trial strategy, which the defendant must overcome. *Id*.

## A. HEARSAY

Defendant argues that defense counsel was ineffective for failing to object to hearsay statements, namely, CJ and Gielniak's testimony about messages Susie sent to CJ and Gielniak's testimony that she spoke with Susie's father and grandmother, and Susie did not come to see them that day. Defendant argues that the messages from Susie to CJ were hearsay within hearsay under MRE 805, and had defense counsel objected, the prosecution would not have been able to establish a foundation that Susie's statements fell within a hearsay exception. The prosecution asserts that these statements were present-sense impressions, and therefore fell within an exception to the hearsay rule.

Hearsay is "a statement other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c).

---

[4] As noted, defense counsel asserted that defendant attempted to file a motion for a new trial acting *in propria persona*, but the trial court did not receive it and there was no motion in the lower court file.

"Hearsay is generally prohibited and may only be admitted at trial if provided for in an exception to the hearsay rule." *People v Gursky*, 486 Mich 596, 606; 786 NW2d 579 (2010). See also MRE 802. There is no dispute that the testimony recalling Susie's messages was hearsay; however, the statements were admissible as a present sense impression. Under MRE 803(1), a hearsay statement is admissible when "(1) the statement must provide an explanation or description of the perceived event, (2) the declarant must have personally perceived the event, and (3) the explanation or description must have been made at a time 'substantially contemporaneous' with the event." *People v Chelmicki*, 305 Mich App 58, 63; 850 NW2d 612 (2014).

These requirements are met. The statements provided a description of the events that took place at East Elza and Susie perceived them personally. The statements were made at a time "substantially contemporaneous" with the event, as the timing of the messages were only a few minutes apart when Susie messaged CJ. "MRE 803(1) recognizes that in many, if not most, instances precise contemporaneity is not possible and hence a slight lapse is allowable." *Id*. (quotation marks and citation omitted). Because Susie's messages were admissible as a present sense impression, any objection by defense counsel would have been futile. See *People v Thomas*, 260 Mich App 450, 457; 678 NW2d 631 (2004).

Next, defendant argues that defense counsel should have objected when Gielniak answered the juror question whether Susie's family was questioned about whether Susie went to see them that day, and Gielniak answered, "Yes. We questioned both her father and her grandmother, who both are the ones that live in Southwest Detroit, and she did not come see them." Defendant argues that this testimony was inadmissible hearsay under MRE 802. This argument lacks merit as Gielniak did not testify as to any direct statement made by Susie's father or grandmother. MRE 801(c). "Where a witness testifies that a statement was made, rather than about the truth of the statement itself, the testimony is not hearsay." *People v Harris*, 201 Mich App 147, 151; 505 NW2d 889 (1993).

Defendant also argues that the testimony was inadmissible under the Confrontation Clause because he did not have the opportunity to cross-examine Susie's father or grandmother. "Controversies over the admission of hearsay statements may also implicate the Confrontation Clause, US Const, Am VI, which guarantees a criminal defendant the right to confront the witnesses against him or her. See also Const 1963, art 1, § 20." *People v Dendel (On Second Remand)*, 289 Mich App 445, 452-453; 797 NW2d 645 (2010). "[T]he Sixth Amendment bars the admission of testimonial statements by a witness who does not appear at trial unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness." *Id*. at 453. "A pretrial statement is testimonial if the declarant should reasonably have expected the statement to be used in a prosecutorial manner and if the statement was made under circumstances that would cause an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id*.

Although Gielniak's statement is testimonial by this standard, and therefore presents a Confrontation Clause issue, defendant has failed to show a reasonable probability that, but for defense counsel's failure to object to the testimony, the result of the proceeding would have been different. *Muhammad*, 326 Mich App at 63. Gielniak's statement was in response to a juror question, not a question posed by the prosecution. The prosecution did not rely on Gielniak's statement during closing argument. Had defense counsel objected, there is no reasonable

probability that the result of the proceedings would have been different, given the overwhelming evidence implicating defendant in the crime. Therefore, defendant has not met his burden to establish ineffective assistance in this regard. *Id*.

## B. PROSECUTORIAL ERROR

Defendant argues that defense counsel was ineffective for failing to object when the prosecutor questioned defendant on cross-examination regarding his propensity for violence, other-acts evidence, and privileged communications. As noted above, the prosecutor did not commit error by questioning defendant about the other-acts evidence because defendant opened the door to such questioning by stating that he was thinking about getting revenge for what happened to Susie. *Figgures*, 451 Mich at 399-400. Had defense counsel objected, or moved for a mistrial or curative instruction, the request most likely would have been denied for defendant having opened the door, and such requests would have been futile. *Whetstone*, 119 Mich App at 554; *McMaster*, 154 Mich App at 570.

As noted above, the prosecution's questioning regarding defendant's communications with defense counsel about an alibi witness was improper, but a harmless error. Likewise, defendant fails to demonstrate a reasonable probability that the result of the proceeding would have been different had defense counsel objected to this testimony. No alibi notice was filed before trial. The prosecution made this clear before defendant testified, and objected during defendant's testimony. Yet defendant continued to testify that he had left the house for several hours during the day, and had met other people. There is no reasonable probability that had defense counsel objected to the questioning related to communications between defendant and defense counsel about an alibi witness that the result of the proceedings would have been any different. *Muhammad*, 326 Mich App at 63. The evidence implicating defendant was overwhelming, and defense counsel's trial strategy was successful in that defendant was convicted of the lesser included offense of second-degree murder rather than first-degree premeditated murder.

## C. FAILURE TO PURSUE DISCOVERY

Defendant argues that defense counsel performed deficiently by failing to formalize a written discovery request, which resulted in withheld evidence, and because defense counsel did not possess these materials, he could not adequately prepare for trial.

A failure to conduct a reasonable investigation can amount to ineffective assistance of counsel. *People v Trakhtenberg*, 493 Mich 38, 52-53; 826 NW2d 136 (2012). "When making a claim of defense counsel's unpreparedness, a defendant is required to show prejudice resulting from this alleged lack of preparation." *People v Caballero*, 184 Mich App 636, 640; 459 NW2d 80 (1990). Defendant fails to meet this burden. He again concentrates on the Player's Market video that would have shown Susie talking on a cell phone, claiming that it would have impeached CJ's testimony that Susie did not have a functioning phone. Defendant cannot show any prejudice resulting from a lack of preparation where defense counsel's strategy resulted in a conviction of the lesser included offense of second-degree murder, rather than first-degree premeditated murder. As such, defense counsel was not ineffective for failing to pursue discovery or adequately investigating the case.

-16-

## D. GIELNIAK'S ALLEGEDLY FALSE TESTIMONY

Defendant argues that defense counsel should have objected when Gielniak testified that defendant's story was not consistent, and that "[a]n indication of deception is when someone's story changes a lot." "It is generally improper for a witness to comment or provide an opinion on the credibility of another witness, because credibility matters are to be determined by the jury." *Dobek*, 274 Mich App at 71. However, Gielniak was not qualified as an expert witness, and therefore MRE 701 governs, which provides, "[i]f the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Gielniak was assigned officer in charge of this case, and testified that the same questions are asked during interrogations to look for deception. She testified that when someone is telling the truth, the answers will be consistent, and that an indication of deception is when a story changes. Gielniak then said that defendant's story was inconsistent.

Gielniak did not improperly comment on the credibility of defendant. *Dobek*, 274 Mich App at 71. Based on her own perception as the officer in charge, MRE 701, she testified that defendant's story was inconsistent. Had defense counsel objected, it would have been futile. *Thomas*, 260 Mich App at 457. "This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight." *People v Rockey*, 237 Mich App 74, 76-77; 601 NW2d 887 (1999). Moreover, defendant cannot demonstrate that he was prejudiced by defense counsel's failure to object to Gielniak's testimony. Defendant himself testified that he was not as forthcoming with the police as he should have been. Therefore, defendant has failed to meet his burden to establish ineffective assistance.

Defendant argues that defense counsel also should have impeached Gielniak's testimony that CJ was consistent in his interview, and offered more evidence that CJ was the perpetrator of the crime. Defendant relies on evidence that was not admitted at trial, or included in the lower court record, to contradict Gielniak's testimony and otherwise suggest that CJ committed the crime. This evidence will not be considered on appeal. *Isagholian*, 208 Mich App at 18. Nor has defendant successfully moved to expand the record. *Lamkin*, 295 Mich App at 703 n 2. Regardless, defendant cannot demonstrate that defense counsel's performance fell below an objective standard of reasonableness or a reasonable probability that the result of the proceeding would have been different because the evidence implicating defendant was substantial. *Muhammad*, 326 Mich App at 63.

## E. CUMULATIVE EFFECT

Lastly, defendant argues that there is a reasonable probability that but for defense counsel's cumulative errors, the result of the proceeding would have been different. As provided above, this Court will reverse and remand for a new trial when the cumulative effect of several errors establishes that the defendant did not receive a fair trial, even though no one error by itself warranted a new trial. *Bahoda*, 448 Mich at 292 n 64; *Cooper*, 236 Mich App at 659-660. The cumulative effect of the actual errors must cause substantial prejudice such that the failure to order a new trial would deny the defendant substantial justice under MCR 2.613(A). *Lewis*, 258 Mich

App at 200-201. Defendant did not suffer from substantial prejudice. Rather, he was convicted of the lesser included offense of second-degree murder, rather than the charged crime of first-degree premeditated murder. Thus, there was no cumulative effect of any errors that warrant a new trial.

## VII. JURY SELECTION

Defendant argues in his Standard 4 Brief, filed under Administrative Order 2004-6, that his right to a fair and impartial jury was violated because he was not convicted by a jury drawn from a fair cross section of his peers. Defendant claims that there were no African Americans in the jury pool until a second group of potential jurors was brought in for selection.

"[T]o properly preserve a challenge to the jury array, a party must raise this issue before the jury is empaneled and sworn." *People v McKinney*, 258 Mich App 157, 161; 670 NW2d 254 (2003). There is no indication in the record that defendant made any objections regarding the composition of the jury array, so this issue is not preserved. *Id*. It is therefore reviewed for plain error affecting substantial rights. *Carines*, 460 Mich at 763.

"The Sixth Amendment of the United States Constitution guarantees a defendant the right to be tried by an impartial jury drawn from a fair cross section of the community." *People v Bryant*, 491 Mich 575, 595; 822 NW2d 124 (2012). To make a prima facie case of a violation of the Sixth Amendment's fair-cross-section requirement, the defendant must show: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Id*. at 597 (quotation marks omitted), quoting *Duren v Missouri*, 439 US 357, 364; 99 S Ct 664; 58 L Ed 2d 579 (1979).

During jury selection, the potential jurors were identified by number only. There is no indication in the lower court record as to the ethnic or racial makeup of the jury pool. At one point during voir dire, the court ran out of jurors from the potential pool, and had to call in a second pool of jurors. When a panel was finally seated, both attorneys stated that they were satisfied with the jury selected.

Similar to *McKinney*, where there was no objection or issue raised before the jury was empaneled, here, too, "there is no evidence in the lower court record to support defendant's argument. Consequently, [this Court has] no means of conducting a meaningful review of defendant'[s] allegations on appeal." *McKinney*, 258 Mich App at 161-162.

## VIII. MOTION FOR DIRECTED VERDICT

Defendant also argues in his Standard 4 Brief that the trial court erred in denying his motion for a directed verdict because the evidence did not establish the elements of first-degree murder.[5]

The trial court's decision on a motion for a directed verdict is reviewed by this Court de novo. *People v Hammons*, 210 Mich App 554, 556; 534 NW2d 183 (1995). The Court evaluates the evidence "in a light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *People v Schrauben*, 314 Mich App 181, 198; 886 NW2d 173 (2016) (quotation marks and citation omitted).

MCR 6.419(A) provides that upon conclusion of the prosecution's proofs, a defendant may seek and obtain an "acquittal on any charged offense for which the evidence is insufficient to sustain a conviction." On the fourth day of trial, after the prosecution rested, defendant moved for a directed verdict. Defendant argued that the elements of first-degree murder were not satisfied because premeditation and deliberation had not been addressed. There was only evidence of the surrounding circumstances and mere conjecture, and barely any evidence putting CJ and Susie in the house at the same time. The court determined that the tying up of Susie demonstrated intent, which Dr. Hanosh testified occurred before she passed away. There was also evidence of assault in two different areas of the home, meaning there was asportation from the living room to the bedroom, and therefore time for premeditation or taking a second look. The fact that she was beaten and suffocated also allowed time to premeditate. Defendant's presence was established by Susie's texts to CJ, sightings of defendant at the store, and the fact that defendant was home when Susie was found by CJ. Therefore, construing the evidence in the light most favorable to the prosecution, the court determined that there was enough evidence for the jury to determine that defendant had the ability to premeditate, and the motion for directed verdict was denied.

"The elements of first-degree murder are (1) the intentional killing of a human (2) with premeditation and deliberation." *People v Bass*, 317 Mich App 241, 265-266; 893 NW2d 140 (2016) (quotation marks and citation omitted). "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *Id*. at 266 (quotation marks and citation omitted). "Premeditation and deliberation may be inferred from all the facts and circumstances, but the inferences must have support in the record and cannot be arrived at by mere speculation." *Id*. (quotation marks and citation omitted). "Though not exclusive, factors that may be considered to establish premeditation include the following: (1) the previous relationship between the defendant and the victim; (2) the defendant's actions before and after the crime; and (3) the circumstances of the killing itself, including the weapon used and the location of the wounds inflicted." *Id*. (quotation marks and citation omitted).

Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that the essential elements of first-degree murder were proved beyond a

---

[5] Defendant, acting *in propria persona*, filed a "Motion for Directed Verdict" in this Court simultaneously with his Standard 4 Brief. This Court entered an order considering this motion to be a motion to supplement his Standard 4 Brief, and granted the motion to supplement the Standard 4 Brief with the arguments raised in the "Motion for Directed Verdict." *People v Johnson*, unpublished order of the Court of Appeals, entered September 16, 2020 (Docket No. 350550).

reasonable doubt. *Schrauben*, 314 Mich App at 198. There was the intentional killing of Susie. *Bass*, 317 Mich App at 265. Dr. Hanosh testified that the manner of her death was homicide. Premeditation and deliberation were established by circumstantial evidence. *Id*. at 266. CJ testified that Susie messaged him saying that she and defendant were arguing that day. There was evidence that defendant attempted to clean up the scene of the crime, as police found faded red wet spots on the carpet that smelled of cleaning product, a fan blowing on the wet spots, and a sponge and towel drenched in blood. The circumstances of the killing indicated that Susie was injured in both the living room and the bedroom, her hands and feet were bound while she was still conscious, and she suffered from severe blunt force trauma to her head and face. Defendant's right hand was swollen when he was questioned by police. Therefore, the trial court did not err in denying defendant's motion for a directed verdict.

## IV. WITNESS SEQUESTRATION

Lastly, defendant argues in his Standard 4 Brief that his due-process right to a fair trial was violated because Gielniak was not sequestered, but still able to testify and be recalled on rebuttal.

To preserve an issue for appellate review, it must be raised, addressed, and decided in the trial court. *People v Danto*, 294 Mich App 596, 605; 822 NW2d 600 (2011). Defendant made no argument at trial that Gielniak should be sequestered under the mutual sequestration order. Therefore, this issue is not preserved, *id*., and reviewed for plain error affecting substantial rights, *Carines*, 460 Mich at 763.

On the first day of trial, the court mentioned that a mutual sequestration order was in place, and during jury selection, the prosecutor introduced himself to the jury pool, as well as Gielniak, who was sitting at the prosecution's table. On the second day of trial, the court again mentioned the mutual sequestration order, and the prosecutor brought to the court's attention that Susie's father and grandmother were in the courtroom, and although they were listed on the witness list, the prosecutor did not intend to call them, and asked if they could stay. Defense counsel agreed to allow it. No objection was ever made to Gielniak remaining at the prosecution's table throughout trial.

On the fourth day of trial, during redirect examination of Gielniak, the court received a question from the jury stating, "Why was this officer seated at the prosecution table and allowed to hear all the testimony when the other witnesses were not allowed to stay[?]" The trial court answered:

So, all—all the witnesses were sequestered, meaning they could not hear each other's testimony. So when a witness is done testifying, the attorneys usually decide whether or not there's—there's a possibility they might be re-called, and if there's no possibility that they might be re-called, the attorneys usually agree to let that person stay if they'd like, or if they think there's a chance that they might call them again, they continue to be sequestered, meaning they can't be in the courtroom.

Detective Gielniak is the officer in charge of the case, and the officer in charge of the case is prosecuting the case with the prosecuting attorney. So, the

officer in charge of the case is always allowed to remain. All right? So that—that is not unusual. It happens in every criminal case. Okay?

Although defense counsel did not object to Gielniak's presence in the court room, defendant fails to establish that the trial court would have ordered sequestration of Gielniak, who was the officer in charge. MRE 615 addresses the exclusion of witnesses and provides:

> At the request of a party the court may order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause.

An officer in charge, as the designated representative for the people, ordinarily is not subject to a sequestration order. *Id*. Moreover, "[a] defendant who complains on appeal that a witness violated the lower court's sequestration order must demonstrate that prejudice has resulted." *People v Solak*, 146 Mich App 659, 669; 382 NW2d 495 (1985). Defendant fails to establish that he was prejudiced. He focuses on the fact that Gielniak was called in rebuttal, and able to testify about the Kilburn's video. Gielniak was properly called on rebuttal because defendant testified that he left the home on East Elza for several hours during the day, and Gielniak testified on rebuttal that the Kilburn's video showed defendant only leaving for a few minutes at a time, and always returning to the home. Therefore, Gielniak was properly called on rebuttal, and defendant cannot establish a plain error that affected his substantial rights because as officer in charge, she was not subject to the mutual sequestration order.

Affirmed.

/s/ Christopher M. Murray
/s/ Karen M. Fort Hood
/s/ Michelle M. Rick

-21-